NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0568n.06

No. 21-3195

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JOSEPH SPARKSMAN, Executor of the Estate of
Raymond M. Price,

      Plaintiff-Appellant,

      v.

UNITED STATES OF AMERICA,

      Defendant,

AMBULATORY CARE SOLUTIONS OF OHIO
LLC,

      Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Dec 07, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

---

Before: BOGGS, GRIFFIN, and MURPHY, Circuit Judges.

GRIFFIN, Circuit Judge.

When staff at a VA Clinic processed Raymond Price's routine bloodwork in the fall of 2015, the results indicated that he was at an increased risk of prostate cancer. Yet the clinic waited a full year to notify him, and shortly thereafter, he was diagnosed with Stage IV prostate cancer. He filed an administrative medical-malpractice claim against the Department of Veterans Affairs, which denied his claim because the clinic's employees are contract, not government, employees. After that denial—now over two years removed from his cancer diagnosis—Price filed this medical-malpractice lawsuit under Ohio law. The district court held that Price's claim against the

contract employer was untimely because it was barred by Ohio's one-year statute of limitations, and not excused by the doctrines of equitable tolling or equitable estoppel. We agree and affirm.

I.

Raymond Price, who died during the pendency of his appeal, was a veteran of the United States Air Force. He received some of his healthcare from the Belmont County VA Clinic, including the actions underlying this lawsuit. The Belmont Clinic is part of the VA Pittsburgh Healthcare System. As is common within the VA healthcare system, the VA contracted with a private entity, Ambulatory Care Solutions, LLC, to provide primary care services at the Belmont Clinic. Ambulatory Care Solutions then created defendant Ambulatory Care Solutions of Ohio, LLC (ACS of Ohio) to discharge its contractual obligations in Ohio, and ACS of Ohio employed the staff at the Belmont Clinic at all relevant times.

On October 2, 2015, Price reported to the Belmont Clinic for his annual physical. His blood was drawn and sent to the main VA Medical Center in Pittsburgh for analysis. Given his family history of prostate cancer, a Prostate-Specific Antigen (PSA) test was ordered. PSA is a protein produced by the prostate. A PSA level over two nanograms per milliliter (ng/ml) indicates the potential presence of prostate cancer and a need for further evaluation. The laboratory completed Price's blood testing the same day and determined that Price had a PSA level of 61.98 ng/ml. The Belmont Clinic did not communicate that test result to Price.

In October 2016, Price returned to the Belmont Clinic for bloodwork, including another PSA test. His PSA level had risen to 145.36 ng/ml. When he returned to the Belmont Clinic for his annual physical on November 16, 2016, he was first informed of his elevated PSA level. An oncologist diagnosed him with advanced prostate cancer on December 13, 2016. Another

oncologist opined that Price's prostate cancer had progressed and "spread to a substantial and significant degree" between the October 2015 and the October 2016 PSA tests.

Price submitted an administrative medical-malpractice claim to the VA in November 2017 (eleven months after receiving his cancer diagnosis), which the VA denied on June 13, 2018. It disclaimed liability because the employees "whose care is at issue" were contract, not government, employees.

On August 23, 2018, Price filed this lawsuit against the United States and the contract employer, defendant ACS of Ohio. Before discovery, defendant[1] filed a motion for summary judgment arguing that Price's claim was a "medical claim" as defined by Ohio law, so it was barred by Ohio's one-year statute of limitations for medical-malpractice claims. The district court agreed in part, finding that Price's claim was a medical claim and that the statute of limitations could not successfully be tolled, but that equitable estoppel might apply, so defendant was not entitled to summary judgment at that time. Following discovery, the district court confirmed that equitable tolling did not apply and—after applying a different legal test—that equitable estoppel did not apply. Accordingly, the district court concluded that the complaint was time-barred and granted defendant's motion for summary judgment.

## II.

We review the district court's decisions on motions for summary judgment de novo. *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as

---

[1]For ease of reference and because the United States is not a party to this appeal (having been dismissed below), we refer to ACS of Ohio simply as "defendant."

a matter of law." *Id.* (citation omitted). This case presents a single state-law claim against ACS of Ohio, so we apply Ohio law. *Felder v. Casey*, 487 U.S. 131, 151 (1988).

Because Ohio law subjects medical claims to a one-year statute of limitations, Ohio Rev. Code Ann. § 2305.113(A), the first question we must address is whether Price's claim is a medical claim or merely an administrative claim. If medical, it is subject to the one-year statute of limitations and plaintiff's complaint may be time-barred. *Id.* Otherwise, it is subject to a two-year statute of limitations, and was timely. *See* § 2305.10(A).

In Ohio, a medical claim is "any claim that is asserted in any civil action against a . . . hospital" or any employee or agent of a "hospital . . . that arises out of the medical diagnosis, care, or treatment of any person." § 2305.113(E)(3). The district court determined that ACS of Ohio is a "hospital" as defined in the statute and neither party challenges this conclusion on appeal. Thus, the only issue before us is whether plaintiff's claim "arises out of" his "medical diagnosis, care, or treatment." It does.

The Ohio Supreme Court has explained that "[t]he terms 'medical diagnosis' and 'treatment' are terms of art having a specific and particular meaning relating to the identification and alleviation of a physical or mental illness, disease, or defect," and that the word "care" "means the prevention or alleviation of a physical or mental defect or illness." *Browning v. Burt*, 613 N.E.2d 993, 1003 (Ohio 1993). Neither the statute nor the Ohio courts have defined "arise." Dictionaries in use at the time the statute was enacted help fill in this definitional gap. *See In re Application to Obtain Discovery for Use in Foreign Proc.*, 939 F.3d 710, 717 (6th Cir. 2019). Then, as now, Black's Law Dictionary defined "arise" as "[t]o originate; to stem (from)[,]" or "[t]o result (from)." *Arise*, Black's Law Dictionary (7th ed. 1999; 11th ed. 2019). Thus, plaintiff's

claim against the Belmont Clinic is a medical claim if it originated, stemmed, or resulted from the prevention, identification, or alleviation of a physical or mental defect, illness, or disease.

This definition resolves the issue. The parties do not dispute the material facts: Price had his PSA levels tested annually because he had a family history of prostate cancer; the test was intended to identify a potential diagnosis of prostate cancer, so a claim about the test itself would certainly be a medical claim; and the transmission of results to Price—and the failure thereof—originated from that medical claim. Thus, a claim grounded in the transmission of test results is a medical claim. Put simply, Price was injured during the (attempted) prevention of a physical illness. Therefore, as the district court concluded, his claim is a medical claim as defined by Ohio law.

Plaintiff brings three arguments against this conclusion, none of which persuade.

A.

First, plaintiff concedes that if his claim is viewed as a "failure to explain test results" claim, it would be a medical claim. *See Schraffenberger v. Persinger, Malik and Haaf, M.D.s, Inc.*, 683 N.E.2d 60, 62 n.2 (Ohio Ct. App. 1996) (holding that a receptionist's erroneous statement that the plaintiff was "sterile" after a vasectomy and follow-up testing was a medical claim); *Brittingham v. Gen. Motors Corp.*, No. 24517, 2011 WL 6352294, at *4 (Ohio Ct. App. Dec. 16, 2011) (holding that a doctor's failure to explain the significance of pulmonary function test results was a medical claim). Price argues, however, that his claim is distinguishable from these cases because he did not even *receive* his test results. We do not see the value in this distinction. First, the amended complaint brought a failure-to-explain claim—it alleged that ACS of Ohio breached its duty to Price by failing to inform him of his 2015 PSA levels "*or the significance* of those levels." (Emphasis added). And second, the distinction is of no consequence because of the

statute's "arises out of" language. The failure to explain test results to a patient is clearly a medical claim. *See Schraffenberger*, 683 N.E.2d at 62 n.2; *Brittingham*, 2011 WL 6352294, at \*4. The necessary predicate act for such a claim is a test, so that claim "arises" out of the test itself. So too does a failure-to-provide test results claim—it begins with and arises out of a test, which is part and parcel of the prevention, identification, or alleviation of a physical or mental defect, illness, or disease.

B.

Plaintiff's next argument relies on several cases in which Ohio courts have ruled that various negligent acts were not "medical claims." But he fails to recognize the common thread in these cases identified by the district court: Each involved an accident wholly removed from the care, diagnosis, or treatment of a medical malady. *See, e.g., Hill v. Wadsworth-Rittman Area Hosp.*, 925 N.E.2d 1012, 1013, 1016 (Ohio Ct. App. 2009) (after discharge from a hospital, the plaintiff tripped and fell while getting out of a wheelchair); *Balascoe v. St. Elizabeth Hosp. Med. Ctr.*, 673 N.E.2d 651, 652-53 (Ohio Ct. App. 1996) (the plaintiff slipped and fell on a piece of plastic while moving from the bathroom to her hospital bed); *Summers v. Midwest Allergy Assocs., Inc.*, No. 02AP-280, 2002 WL 31894902, at \*7 (Ohio Ct. App. Dec. 31, 2002) (a medicine cabinet fell on the plaintiff's head while she was receiving allergy treatment). Plaintiff's claim here, however, directly arises from his treatment at the Belmont Clinic.

C.

Finally, Price asserts that the transmission of test results is a purely administrative action that requires no "professional skill." In support of this argument, he cites a line of caselaw originating from *Rome v. Flower Memorial Hospital*, 635 N.E.2d 1239 (Ohio 1994). There, the Ohio Supreme Court considered two consolidated cases, one involving a woman who was injured

while being secured to a radiology table, and the other a man whose wheelchair collapsed during transportation from physical therapy. *Id.* at 1242. The court held that both instances presented medical claims because the events that led to their injuries were "ancillary to and an inherently necessary part" of receiving medical care. *Id.* The process of securing the woman to the table was "ancillary to and an inherently necessary part" of the administration of an x-ray, the x-ray had been ordered to "identify and alleviate her medical complaints," and she "was being assisted by an employee of [the defendant], which employee was required to exercise a certain amount of professional expertise in preparing [her] for X-ray." *Id.* As for the man, his treating physician had ordered physical therapy as part of rehabilitation from knee surgery and a hospital employee was taking him to and from the physical therapy department in a wheelchair, so the court determined that the transportation was "ancillary to and an inherently necessary part of his physical therapy treatment" and that the employee was "required to use a certain amount of professional skill" while transporting the patient. *Id.*

This "professional skill" language has since been cited by several panels of the Ohio Court of Appeals. *See, e.g.*, *Grubb v. Columbus Cmty. Hosp.*, 691 N.E.2d 333, 335 (Ohio Ct. App. 1997) (patient was injured while an orderly escorted him from one diagnostic procedure to another); *Cooke v. Sisters of Mercy*, No. CA97-09-181, 1998 WL 221320, at *4 (Ohio Ct. App. May 4, 1998) (patient was dropped while moving from bed to a wheelchair and again when an overhead trapeze collapsed on him several times). In both cases, as in *Rome*, the deciding court briefly considered whether the employee was required to use some level of "professional skill" as part of its analysis. Importantly, these decisions consider the use of professional skill as a

relevant fact that tends to show that a claim is a medical claim, and do not—as plaintiff asks that we do—treat the use of professional skill as a separate dispositive requirement.[2]

Accordingly, we reject plaintiff's argument that his claim is not a medical claim even assuming that it required no professional skill.

* * *

In sum, Price's claim is a medical claim if it originated, stemmed, or resulted from the prevention, identification, or alleviation of a physical or mental defect, illness, or disease. Price's claim began with a test intended to detect prostate cancer, and his claim that the Belmont Clinic failed to transmit those test results to him arises out of that underlying medical claim. Thus, the district court properly held that the claim at issue here is a "medical claim" under Ohio law.

III.

Because Price's claim is medical, he was required to bring it "within one year after the cause of action accrued." § 2305.113(A). The district court concluded that the cause of action accrued on the date of his cancer diagnosis: December 13, 2016. The parties do not dispute this finding or that his August 23, 2018, complaint was outside the one-year statute of limitations. Instead, they disagree as to whether equitable tolling saves the complaint. The district court held that it did not, and because the facts underlying its equitable-tolling decision are undisputed, our

---

[2]We are aware that the Ohio Court of Appeals has considered the "professional skill" element as a wholly separate factor in a single case. In 2012, it issued an unpublished opinion that explicitly used a two-part test: first, the court evaluated whether the plaintiff's claim "arose out of" treatment as defined in *Browning* and second, whether the events leading to injury required a "'certain amount' of professional expertise or professional skill." *Conkin v. CHS-Ohio Valley, Inc.*, No. C-110660, 2012 WL 2367391, at *2 (Ohio Ct. App. June 22, 2012) (quoting *Rome*, 635 N.E.2d at 1242). However, we are unable to find any other opinions, before or since the *Conkin* decision, that treat the "professional skill" issue as a separate dispositive factor, and *Conkin* alone holds very little persuasive value. The weight of Ohio law shows that we may consider whether the individual responsible for the alleged malpractice exercised "professional skill" as a relevant fact, but need not evaluate that as a dispositive factor.

review is de novo. *Zappone v. United States*, 870 F.3d 551, 555 (6th Cir. 2017). Unfortunately for plaintiff, his equitable-tolling argument fails on both the law and the facts.

First, the facts. Price waited until November 15, 2017—approximately eleven months after his cancer diagnosis—to file his administrative claim, leaving about one month in the statute of limitations. Even assuming that the statute of limitations could be tolled while the administrative claim was pending (from November 15, 2017, until June 13, 2018), Price waited over *two* additional months to file his complaint on August 23, 2018. Because he had less than one month left in the one-year statute of limitations but waited over two months to file, tolling the statute of limitations cannot save Price's complaint.

Next, the law. Under Ohio law, once a claim has accrued, "the failure of the plaintiff to learn the identity of an allegedly negligent party does not delay the running of the statute of limitations." *Erwin v. Bryan*, 929 N.E.2d 1019, 1025 (Ohio 2010). Price seeks respite from this rule in equitable tolling, which is available to a litigant who can "demonstrate that he or she diligently pursued his or her rights, but some extraordinary circumstance stood in his or her way and prevented timely action." *McCualsky v. Appalachian Behav. Healthcare*, 100 N.E.3d 1049, 1055 (Ohio Ct. App. 2017). The doctrine is "to be applied sparingly and only in exceptional circumstances." *Id.*

Ohio courts have long required a plaintiff to investigate and discover the identity of the alleged tortfeasor to demonstrate due diligence. *See, e.g.*, *Flowers v. Walker*, 589 N.E.2d 1284, 1288 (Ohio 1992). This is fatal to Price's claim: The undisputed facts demonstrate that he did not investigate the identity of the proper defendant for his claims, and instead, simply assumed that all Belmont Clinic employees were employed by the VA. Due diligence requires more than waiting until facts are discovered. *See id.* at 1288 ("the 'cognizable event' itself puts the plaintiff on notice

to *investigate* the facts and circumstances relevant to her claim in order to pursue her remedies." (emphasis added and citation omitted)).

*Whittlesey v. Cole*, 142 F.3d 340 (6th Cir. 1998), is instructive. In that case, the wife of a retired Navy member died, allegedly due to medical malpractice during treatment at a naval hospital in Tennessee. *Id.* at 341. Her husband, Stephen Whittlesey, filed an administrative claim against the Navy, but that claim was denied because the treating physicians were civilian doctors employed by a contracting corporation. *Id.* at 342. Whittlesey then filed a federal complaint after Tennessee's one-year statute of limitations had lapsed. *Id.* He claimed that the statute of limitations must be tolled because he did not know that the physicians were civilians until the government informed him of their civilian status via the administrative denial. *Id.* at 342-43. We disagreed, noting that "it was incumbent upon the plaintiff or plaintiff's attorney to exercise reasonable care, to investigate or to take any action to determine the employment status of an alleged tort-feasor." *Id.* at 343 (quotation marks and citation omitted). We then explained that "[h]ad Whittlesey exercised reasonable diligence, he may have likely learned through inquiry that [the treating physician] was a civilian doctor and therefore learned of his need to sue [him] personally before the statute [of limitations] had run." *Id.* "His lack of knowledge could have been alleviated by simple, basic investigation." *Id.* at 343–44 (citation omitted). Thus, Whittlesey had not exercised sufficient due diligence to toll the Tennessee statute of limitations. *Id.* at 344.

We reach the same result here under Ohio law. The undisputed facts show that plaintiff did not perform even a basic investigation. He did not ask anyone who employed the staff at the Belmont Clinic. Had he inquired, he likely would have learned that the Belmont Clinic staff were civilian employees and that he needed to file a complaint against them before the one-year statute of limitations expired. To the extent plaintiff now tries to salvage his position by alleging that

ACS of Ohio misled him about who employed the Belmont Clinic staff, we cannot agree. Plaintiff *never asked* who employed Belmont Clinic staff. There is no evidence that anyone intentionally misled him. Plaintiff incorrectly assumed a fact and because of that failure to exercise due diligence, the statute of limitations ran before he filed a complaint. He cannot benefit from equitable tolling.

IV.

The final issue is whether the district court erred in ruling that defendant was not equitably estopped from invoking the statute of limitations. On de novo review, *Bridgeport Music, Inc. v. Diamond Time, Ltd*., 371 F.3d 883, 889, 891 (6th Cir. 2004), we affirm the district court.

"Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *State ex rel. Chavis v. Sycamore City Sch. Dist. Bd. of Educ*., 641 N.E.2d 188, 196 (Ohio 1994). Generally, to invoke the doctrine of equitable estoppel, a party must demonstrate "(1) a factual misrepresentation, (2) that the misrepresentation is misleading, (3) that the misrepresentation induced actual reliance that was reasonable and in good faith, and (4) that it caused detriment to the relying party." *Hoeppner v. Jess Howard Elec. Co*., 780 N.E.2d 290, 297 (Ohio Ct. App. 2002). "[E]quitable estoppel generally requires actual or constructive fraud." *Chavis*, 641 N.E.2d at 196. "Constructive fraud does not require proof of fraudulent intent[.]" *Cohen v. Estate of Cohen*, 491 N.E.2d 698, 700 (Ohio 1986) (citation omitted). But it does require the "breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Id.* at 699–700 (citation omitted). Therefore, constructive fraud can be based on affirmative misrepresentations or on a party's failure to fully disclose material facts when

there exists a duty to speak. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co*., 684 N.E.2d 1261, 1269 (Ohio Ct. App. 1996).

These four elements are all the district court considered in its opinion denying defendant's first motion for summary judgment. The court concluded that plaintiff had raised a genuine question of material fact because it was unclear whether defendant had a duty to disclose its identity to plaintiff. When it revisited this ruling following discovery, it avoided the duty-to-disclose issue and instead, citing an Ohio Supreme Court case, added a fifth factor to its test: To apply equitable estoppel to a statute of limitations, a plaintiff must show that the defendant acted in a manner that was "designed to prevent" the plaintiff from filing suit. (Citing *Doe v. Archdiocese of Cincinnati*, 880 N.E.2d 892, 895 (Ohio 2008)). It then found that plaintiff had not done so because he had not identified a single action taken by ACS of Ohio that was intended to thwart his lawsuit. We agree with the district court that the "designed to prevent" language is an element of equitable estoppel under Ohio law, and that plaintiff did not raise a genuine dispute of material fact on that issue.

First, the caselaw makes clear that while the four-factor test applies to equitable estoppel generally, the Ohio courts have narrowed the application of equitable estoppel in the statute-of-limitations context by adding the "designed to prevent" language as a fifth factor. *See, e.g., Walburn v. Lockheed Martin Util. Servs., Inc*., 443 F. App'x 43, 49 (6th Cir. 2011) ("[T]he Ohio courts have narrowed the kind of misrepresentation that must be alleged in order to invoke equitable estoppel to preclude a defendant from asserting a statute-of-limitations defense.") This factor flows from *Doe*. There, the Ohio Supreme Court found equitable estoppel inapplicable in a lawsuit against the Archdiocese of Cincinnati involving a priest who impregnated a minor girl in the 1960s and then pressured her to place the baby up for adoption. *Doe*, 880 N.E.2d at 893–96.

The *Doe* court held that an untimely complaint can be saved by equitable estoppel if a plaintiff demonstrates that a defendant "did anything that was *designed to prevent* [her] from filing suit." *Id.* at 895 (emphasis added). And the plaintiff did not do so there: While the complaint alleged that the priest and others made many statements, none of those statements addressed the general subject of litigation or Doe's complaint specifically to show she was prevented from filing suit. *Id.*

Plaintiff contends that he demonstrated such an action, so summary judgment was granted in favor of defendant in error. He focuses on the following facts: The official VA website directs veterans to the Belmont Clinic as a VA facility; the signage at the Belmont Clinic said "VA"; Price believed he was receiving care from the VA; Price's test results stated at the top "Report from: Belmont County VA Clinic"; when Price requested his test results, the VA responded; and in December 2016, Price received a letter from Belmont Clinic that stated "How can the [VA] serve you better?" and identified the Belmont Clinic as the "VA facility providing your care." True, these facts demonstrate that the Belmont Clinic appeared to be a division of the VA. But none imply that ACS of Ohio made representations or failed to disclose information to hinder litigation generally or this lawsuit specifically. As in *Doe*, none of these facts establish that ACS of Ohio did anything that was designed to prevent Price from filing suit (like lying or withholding information in response to an inquiry from Price or his attorney). At the end of the day, "[t]he purpose of equitable estoppel is to prevent fraud," *id.* at 895, and nothing that ACS of Ohio did was fraudulent.

V.

For these reasons, we affirm the judgment of the district court.

-13-